UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

KYLE MICHAEL MASKELL,           )
                                )
        Plaintiff,              )
                                )
                                )
    v.                          )        Case No. 5:16-cv-60
                                )
NANCY A. BERRYHILL, Acting      )
Commissioner of Social Security,[1] )
                                )
        Defendant.              )

**OPINION AND ORDER**
**(Docs. 8, 9)**

Plaintiff Kyle Michael Maskell, brings this action under 42 U.S.C. § 405(g), requesting

reversal of the decision of the Commissioner of Social Security denying his applications for

supplemental security income ("SSI") and disability insurance benefits ("DIB"). Pending before

the court is Mr. Maskell's motion to reverse the Commissioner's decision (Doc. 8) and the

Commissioner's motion to affirm (Doc. 9). For the reasons stated below, the court GRANTS

Mr. Maskell's motion to reverse and DENIES the Commissioner's motion to affirm.

**Background**

Mr. Maskell, born in 1988, applied for SSI and DIB benefits on January 9, 2013, alleging

a disability onset date of December 31, 2010. (AR 30, 55.) The claims were denied initially on

July 3, 2013, and on reconsideration on October 4, 2013. (AR 30, 113, 130, 148.) At his hearing

before Administrative Law Judge ("ALJ") Matthew Levin on January 6, 2015, Mr. Maskell

amended his alleged onset date to May 9, 2011. (AR 30, 54–55.)

---

[1] The court has amended the caption to reflect the current Acting Commissioner of Social
Security, who assumed office on January 20, 2017. *See* Fed. R. Civ. P. 25(d).

At the hearing, Mr. Maskell testified that he went to school through ninth grade, and, while he had attempted to obtain a GED, he had not obtained it yet. (AR 55.) He lives with his girlfriend and daughter, and receives both food stamps and Medicaid benefits. (AR 56.)

Mr. Maskell testified that he had not worked since May 2011 and had not performed any small or odd jobs during that time either. (AR 56.) The ALJ asked Mr. Maskell to explain why he had previously reported to medical professionals that he had different "odd jobs" after May 2011. (AR 56–57.) Mr. Maskell stated that in "no way" had he earned more than $1,080 in a month doing odd jobs. (AR 57.)

Mr. Maskell's last job, in 2009 and 2010, had been at a recycling or waste disposal plant run by Casella, where he had worked as a line sorter. (AR 58, 74.) He said that he had "lots of anxiety and lots of stress" when working there and had frequent arguments and problems with his supervisors and coworkers. (AR 58–59.) He was fired after he tossed a glass bottle into a wall and it shattered near another employee. (AR 58–59.) He had also previously worked at a K-Mart for three years, stocking shelves and gathering carts. (AR 59.) At work, he would try to avoid customers and stay off the sales floor "as much as I could because it was just . . . too stressful." (AR 60.) He would get severe anxiety being around "more than five strangers" and was frequently angry with coworkers and supervisors. (AR 61.) He handled his anger by yelling, breaking things in the stock room, and isolating himself. (AR 61.) On one occasion, he "threw a TV down a flight of stairs in the back stock room," and on another he "ripped a railing off the wall." (AR 69.) He was fired from that job after he was placed on cashier duty even though he had no experience as a cashier, and mishandled money, giving customers too much change. (AR 59–60.)

Mr. Maskell also testified to transportation difficulties. He stated that he does not have a driver's license, occasionally gets rides through the Howard Center, and occasionally rides the bus. (AR 62–63.) But Mr. Maskell said that he had been "almost kicked off of the bus" a few times because he "scared a lot of people on the bus." (AR 63.) He said that he "feel[s] extremely uncomfortable just sitting on the bus" and "[w]hen there's large groups of people," he thinks about "a plan on how to pretty much take out everyone on the bus." (*Id.*)

He also experiences anxiety and panic attacks every day. (AR 63.) They last at least an hour, but he stated that they can last the whole day "until I can get up again in the morning and try and start fresh." (*Id.*) He attempts to alleviate the attacks by listening to loud music, playing his guitar, and trying to "get to a cold, dark area by myself." (AR 64.)

With regard to household chores, Mr. Maskell testified that he does "basic little things" like sweeping and changing the cat litter, but that his girlfriend must remind him to do these things "[a]lmost constantly." (AR 65.) He says that chores stress him out because he cannot sleep and stays up late and is therefore "groggy" and "irritable all day." (*Id.*) He testified that he does not go grocery shopping and that his girlfriend "exclusively does that." (*Id.*) He says that he does not go shopping because there are "[t]oo many people," that he has "broken things in the stores just because there's so many people," and as a result has "actually been asked to leave stores." (AR 66.) When there are large groups of people, Mr. Maskell "feel[s] like everyone's staring at me and judging me and they know something about me and . . . it makes me uneasy. . . . I feel like they look at me and they know what happened to me growing up." (*Id.*) The ALJ asked Mr. Maskell about his function report, completed in May 2013, in which Mr. Maskell reported that he did go shopping in stores. (AR 70, 288.) Mr. Maskell explained that things had been getting worse and it had been months since he had gone shopping. (AR 70.)

He also said that he would only go out shopping if there was a "dire need," and he would run across the street to the gas station to buy it. (AR 73.)

Mr. Maskell also testified to limited social interactions. He said that he never socialized and had no friends, and spent no time with anyone but his girlfriend, his daughter, and his mother. (AR 66.) He also avoids interactions with neighbors because "the only thing worse than talking to a stranger is talking to a neighbor because they're just going to be there and keep talking to you and asking for more things and it's just an added obligation that's just more stress and it's just not worth it." (AR 67.) When he is home, he testified, he would avoid answering the door when he knew it was a neighbor. (*Id.*)

Mr. Maskell also testified about an incident at a doctor's office. On one visit, when he went with his girlfriend, the clerk said there was something wrong with his insurance and he became quite angry. (AR 68.) He yelled at the clerk, walked over to the elevator, and "repeatedly punched the elevator button" because "the waiting room was full and everyone was standing there staring at me because I was obviously being loud at the counter. Everyone was staring at me." (*Id.*) Mr. Maskell cut his hand and broke the elevator. (*Id.*) Other patients told him to "calm down" because there were children in the waiting room, but Mr. Maskell said that "I didn't care. I didn't care. I was like, I don't give a fuck, let's go right now, like right in the waiting room." (*Id.*)

Mr. Maskell also testified to a history of substance abuse. He said that he had last had a drink on January 8, 2014, and had been "going on almost a year now without a single drop" of alcohol. (AR 71.) The ALJ then questioned Mr. Maskell about an incident in which, after drinking, Mr. Maskell became agitated while standing outside a store and attacked a parked car. (AR 72.) He was charged with criminal mischief for the incident and according to a doctor's

note had a court date in May 2014.  (*Id.*)  The ALJ asked him whether the incident had been

before January 2014, and Mr. Maskell responded that he didn't think so.  (*Id.*)  Mr. Maskell also

said that he occasionally smoked marijuana, and had most recently done so a week earlier

because it helped him sleep.  (AR 71.)

### ALJ Decision

The ALJ is required to follow the five-step process in determining a claimant's disability.

*Machia v. Astrue*, 670 F. Supp. 2d 326, 333 (D. Vt. 2009) (internal citation omitted);

*see* 20 C.F.R. §§ 404.1520, 416.920.  The answer at each step determines if the next step must be

addressed.  *Machia*, 670 F. Supp. 2d at 330.  At the first step the ALJ determines if the claimant

has engaged in substantial gainful activity since the alleged onset date of his disability.  *Id.*  If the

answer is no, step two then asks if the claimant has any "impairments" that are "severe."  *Id.*

If there is one or more severe impairment, step three evaluates whether any of these

impairments meet the listed impairments in Appendix 1 of the regulations; if an impairment

meets the listing the claimant is deemed disabled.  If it does not, step four asks whether the

claimant retains the residual functional capacity ("RFC") to do his past relevant work.  *Id.*  If the

claimant can no longer do his past relevant work, step five asks whether the claimant is able to

do any job available in significant numbers in the national economy.  *Id.*  "The claimant bears

the burden of proving his case at steps one through four, . . . and at step five, there is a 'limited

burden shift to the Commissioner' to 'show that there is work in the national economy that the

claimant can do.'"  *Larkin v. Comm'r of Soc. Sec.*, No. 2:10-CV-291, 2011 WL 4499296, at *2

(D. Vt. Sept. 27, 2011) (quoting *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)).

At step one, the ALJ determined that Mr. Maskell had not engaged in substantial gainful

activity since May 9, 2011, his amended onset date.  (AR 33.)  At step two, he found that

Mr. Maskell had the following severe impairments: attention-deficit hyperactivity disorder,

depression, anxiety, a personality disorder, and poly substance abuse. (*Id.*) At step three, the ALJ found that none of Mr. Maskell's impairments met or medically equaled a listed impairment. (AR 35.)

The ALJ determined that Mr. Maskell had an RFC to "perform a full range of work at all exertional levels," but with specified non-exertional limitations. (AR 37.) Mr. Maskell was "limited to simple unskilled work in a low stress environment (defined as requiring little to no change in the work setting and little to no need for the use of judgment." (*Id.*) The ALJ noted that he could "maintain attention and concentration for two hour increments throughout an eight-hour workday and forty-hour workweek." (*Id.*) Mr. Maskell needed to "avoid social interaction with the general public" and could have "only limited social interaction with coworkers," but could "sustain routine social interaction with supervisors." (*Id.*)

At step four, the ALJ found that, with this RFC, Mr. Maskell could perform his past relevant work as a salvage laborer, both as he actually performed it and as the position is performed generally in the national economy. (AR 44.) Concluding that Mr. Maskell was not disabled, the ALJ did not reach step five. (*Id.*)

The Appeals Council denied review on November 13, 2015. (AR 6.) Mr. Maskell obtained an extension to March 24, 2016 to file a civil action seeking court review. (AR 1.) This case was filed on March 4, 2016. (Doc. 1.)

## **Standard of Review**

Disability is defined by the Social Security Act in pertinent part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if it is determined that his "impairments

6

are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

When considering the ALJ's disability decision, the court "review[s] the administrative record de novo to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The decision is subject to a factual review determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981); *see also, e.g., Johnson v. Comm'r of Soc. Sec.*, No. 2:13-cv-217, 2014 WL 2118444, at *3 (D. Vt. May 21, 2014).

## Analysis

Mr. Maskell raises several challenges to the ALJ's decision. First, he argues that the ALJ's credibility determination is flawed. (Doc. 8-1 at 16–18.) Second, he argues that the ALJ should have accorded greater weight to the opinions of his treating psychiatrist and his therapist. (Doc. 8-1 at 10–14.) Third, he identifies other flaws with the ALJ's RFC determination that, he asserts, render it unsupported by substantial evidence. (*Id.* at 8–10, 14–16.)

## I.      Credibility Determination

To determine whether the intensity and persistence of a claimant's symptoms are as severe as a claimant asserts, an ALJ must consider "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [his] symptoms affect [him]." 20 C.F.R. §§ 404.1529(a), 416.929(a).  The ALJ "considers whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [his] statements and the rest of the evidence, including [his] history, the signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]." *Id.* §§ 404.1529(c)(4), 416.929(c)(4).  Generally, "[i]t is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)); *accord Puente v. Comm'r of Soc. Sec.*, 130 F. Supp. 3d 881, 893–94 (S.D.N.Y. 2015).  But a court may review such a finding where it is "based on so serious a misunderstanding of [the claimant's] statements," that the decision "cannot be deemed to have complied with the requirement that" the ALJ "consider all of the evidence of record." *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010).

In evaluating Mr. Maskell's credibility, the ALJ concluded that, while his "impairments could reasonably be expected to cause his alleged symptoms[,] . . . his statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible."  (AR 39.) The ALJ offered three reasons in support of this conclusion: "inconsistences in the claimant's various statements, his various reports of work activity, and the objective medical findings" which "suggest that his impairments are not as severe and limiting as alleged." (*Id.*)

Mr. Maskell takes issue with the first category. He argues that the inconsistencies identified by the ALJ—relating to his use of public transportation, his shopping habits, and his consumption of alcohol—rely on a misreading of his testimony and the record evidence. (Doc. 8-1 at 16–18.) The court takes each inconsistency in turn.

First, the ALJ apparently thought it inconsistent that Mr. Maskell "testified that he has difficulty being around even a small group of five people," but "later testified that he is capable of using public transportation, though with some difficulty"; the ALJ also cited to a function report in which Mr. Maskell marked that he could use public transportation. (AR 38.)

It is hard to identify any inconsistency in these statements, especially when they are taken in context. At the hearing, Mr. Maskell testified that "I really have severe issues around—like more than five strangers is just too much for me, I shut down." (AR 60–61.) Then, in response to a question about whether he had "problems riding the bus" even though he occasionally rode it, Mr. Maskell responded:

> Yes. Yes. I do. There's been a couple of times where I've been almost kicked off of the bus. I've scared a lot of people on the bus. I feel extremely uncomfortable just sitting on the bus. When there's large groups of people, I pretty much am sitting there and I have to—I think and I have a plan, because I know that—I feel like that everyone's looking at me and I have a plan on how to pretty much take out everyone on the bus and I have back up plans as to where if like the person back here comes at me first or if somebody from over here, that I just sit there and I just listen and wait for an opportunity. It's the only way I feel comfortable and safe on there is when I have my plans set and I'm just sitting there waiting so I'm prepared for anything that may come at me from any angle.

(AR 63.) And in the function report, Mr. Maskell marked that he could use public transportation, but then put in parentheses "very bad," and explained that "the bus has lots of people/the public trigger[s] my anxiety and increase[s] my chances of a bad episode." (AR 288.)

Saying that one has issues around more than five strangers and then saying that, while one *can* ride the bus, the presence of so many people causes significant anxiety is entirely consistent. To read the record otherwise would be a substantial mischaracterization.

Next, the ALJ noted inconsistencies in Mr. Maskell's reported shopping habits. (AR 38.) Mr. Maskell initially testified that his girlfriend "exclusively does" the shopping—when her friend "gives her a ride to the grocery store twice a month." (AR 65.) Later in the hearing, the ALJ asked Mr. Maskell when last he had been shopping, Mr. Maskell said it had been "months since I attempted [to go shopping] and it didn't work out well." (AR 70.) The ALJ then pointed out that, in a function report (AR 288), Mr. Maskell wrote that he did go shopping in stores. (AR 70.) Mr. Maskell responded that he had last gone "six months ago maybe" and that "things are just getting worse and worse for me." (AR 70.) Later, Mr. Maskell clarified if he went shopping, he would go "for dire needs, we need an egg or we need a milk or something, like I'll have to force myself to run to a gas station, which luckily is like right diagonally across from our apartment. And even that's . . . I force myself to do it." (AR 73.)

Again, the court cannot discern an inconsistency in Mr. Maskell's statements. Mr. Maskell filled out the function report, upon which the ALJ questioned his shopping habits, in May 2013, twenty months before the hearing in January 2015. In that report, he specified that he did "not go [shopping] unless it's something we need, then I go as fast as I can. The longer I'm in public the greater chance I will snap and hurt someone. Has happened more than once in the past." (AR 288.) Then, at the hearing, he specified that he had not gone shopping in months as his symptoms had worsened and also explained that any shopping he did was for urgent necessities, as opposed to the twice-monthly shopping trips taken by his girlfriend. As the Second Circuit has explained, a claimant's testimony about current living habits does not

necessarily contradict written statements from almost two years earlier, especially where, as here, the claimant reasonably explains any potential inconsistency. *See Genier*, 606 F.3d at 50.

Last, the ALJ identified an inconsistency in Mr. Maskell's testimony regarding his alcohol consumption. At the hearing, in January 2015, Mr. Maskell testified that he had not consumed alcohol since January 8, 2014. (AR 71.) The ALJ then questioned Mr. Maskell about a charge for "unlawful mischief or behavior that occurred when [he was] drinking," for which, according to a doctor's note, Mr. Maskell had had a court date for in May 2014. (AR 71.) The ALJ asked whether the incident was "before January of 2014," and Mr. Maskell responded that he did not believe so. (AR 72.) Thus, the ALJ concluded, while Mr. Maskell testified that he had "not used alcohol since January 8, 2014," "treatment records continue to reference a diagnosis for alcohol abuse, as well as pending criminal charges related to his continued alcohol use" and Mr. Maskell "testified that his alcohol related criminal behavior occurred after January 2014." (AR 38.)

But the record shows that the "alcohol related criminal behavior" in question occurred well before January 2014. The ALJ relied on a clinical assessment by Dr. Lasek, conducted in November 2014, that, under the heading "Legal History," stated: "The patient reports having had numerous legal charges in the past and has been incarcerated for 9 months in the past. He has a court day on May 1 for [un]lawful mischief due to behavior that occurred when he was drinking." (AR 805.) But this statement in the 2014 assessment was apparently copied verbatim from clinical assessments in April and May 2012. (AR 456, 461.) Other evidence confirms that the alcohol-related incident happened in 2011. (AR 417, 445–46.)

The ALJ's conclusion that Mr. Maskell's statement about recent alcohol consumption was inconsistent with the record is understandable, but fundamentally mistaken. It is clear from

the record that the remark in the 2014 assessment was merely copied from assessments two years earlier, and therefore no longer a basis on which to question Mr. Maskell regarding his drinking habits in 2014.

The case must be remanded because the ALJ's credibility determination relied on perceived inconsistencies that rely on a mischaracterization of the record. On remand, the ALJ must reevaluate Mr. Maskell's credibility in light of the court's conclusions.

## II.    Opinion Evidence

### A.    Dr. Joseph Lasek

Mr. Maskell challenges the ALJ's decision to accord little weight to the opinions of his treating psychiatrist, Dr. Joseph Lasek. Dr. Lasek saw Mr. Maskell as a patient from at least April 2012 through December 2014, and in addition to treatment notes from throughout this period, Dr. Lasek completed three forms which the ALJ interpreted as medical opinions.

The treating-physician rule "generally requires a measure of deference to the medical opinion of a claimant's treating physician." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam); *see also* 20 C.F.R. §§ 404.1527, 416.927(c)(2) (2012).[2] Under the rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)).

---

[2] Sections 404.1527 and 416.927 have been revised effective March 27, 2017. *See generally Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). Throughout this decision, unless otherwise noted, the court cites and applies the regulations that were in effect at the time of the ALJ's decision.

Even when a treating physician's opinion is not given controlling weight, it is still entitled to some weight because treating physicians are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating physician's opinion is not given controlling weight, the weight to be given the opinion depends on several factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is of a specialist; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

The Commissioner is required to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Nevertheless, the ALJ is not required to "slavish[ly]" recite each of the factors; the ALJ's analysis is sufficient if his or her "reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Batease v. Berryhill*, No. 2:16-cv-133-jmc, 2017 WL 1102659, at *7 (D. Vt. Mar. 24, 2017) (ALJ "need not explicitly discuss each of the regulatory factors; rather, he or she must apply 'the substance of the treating physician rule'" (quoting *Halloran*, 362 F.3d 28 at 32)); *Alexander v. Comm'r of Soc. Sec.*, No. 5:14-cv-00039, 2014 WL 7392112, at *5 & n.1 (D. Vt. Dec. 29, 2014) (court may find that ALJ considered evidence even if ALJ did not cite it).

In May 2013, Dr. Lasek completed a mental status report regarding Mr. Maskell. (AR 522, 647.) He noted that Mr. Maskell was fairly groomed and casually dressed, had

adequate energy levels, and oriented to person, place, and time. He wrote that Mr. Maskell had a congruent and restricted affect, and was agitated, had a "low frustration tolerance," and was in an "angry" and "very anxious" mood. While Mr. Maskell did not have any hallucinations or delusions, Dr. Lasek noted that he was "extremely hypervigilant" and "suspicious of others." Mr. Maskell also had "violent thoughts at times" and had had "verbal altercations with strangers when angry or feeling threatened." Dr. Lasek noted that Mr. Maskell had "very significant difficulties relating to others because of anger/low frustration tolerance." He had impaired attention and concentration, and reported minor memory problems. Mr. Maskell also suffered from chronic insomnia, which had been only partially treated with medication and had an impaired appetite.

In November 2014, Dr. Lasek completed a form to enroll Mr. Maskell in the "Community Rehabilitation and Treatment" ("CRT") program administered by the Vermont Department of Mental Health. (AR 800–02.) He marked that Mr. Maskell had been diagnosed with "Major Depressive Disorder" and "Borderline Personality Disorder (severe)" and under "Treatment History," marked that Mr. Maskell had participated in six-months of outpatient mental health treatment "with no evidence of improvement." (AR 801.) He also checked boxes specifying Mr. Maskell's limitations: he had a "serious impairment in social, occupational, or self-care skills"—specifically an "inability to perform close to expected standards in school, work, or parenting responsibilities"; he "displays maladaptive, dangerous, and impulsive behaviors"—specifically that he "damages or destroys property"; and that he "requires assistance in basic life and survival skills"—specifically with household management and accessing community services. (AR 801–02.)

In a medical source statement, completed in December 2014, Dr. Lasek opined that Mr. Maskell met the listings for an anxiety related disorder (12.06) and an affective disorder (12.04). (AR 792–93.) As a consequence, Mr. Maskell had "extreme" difficulties in performing the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (AR 794.) He noted that Mr. Maskell had had at least four extended episodes of decompensation. (AR 794.) He checked boxes that that Mr. Maskell's mental illness was "characterized by adverse responses to seemingly trivial circumstances," and that this would occur at work. (AR 795.) He also checked boxes that Mr. Maskell would "cease to function effectively" when either receiving criticism from supervisors or having a conflict with a coworker. (AR 795.) He opined that Mr. Maskell would have difficulty "responding appropriately" to coworkers, supervisors, the general public, and changes at work. (AR 795.) He estimated that Mr. Maskell's inappropriate reactions would occur five times a week and wrote that Mr. Maskell "responds with extreme mood swings, frustration, anger and this leads to externalizing symptoms such as screaming, hitting objects & risk for attacking others can be high when he perceives a threat from others." (AR 795.) He noted that Mr. Maskell might be expected to miss work three times a week. (AR 796.) In response to a prompt to "describe and state what medical/clinical findings support your conclusion," Dr. Lasek wrote that Mr. Maskell "has difficulty functioning on a basic level at home," and that the "stress of work would be expected to worsen this." (AR 796.)

The ALJ attributed little weight to these opinions. (AR 42.) The ALJ concluded that the "extreme limits in activities of daily living, social functioning, and concentration, persistence or pace" specified by Dr. Lasek were "wholly inconsistent with the medical evidence of record, including his own treatment notes, and the evidence of record as a whole." (AR 42.) Instead,

"Dr. Lasek's treatment notes reveal normal mental status examinations," and at one point, Dr. Lasek "even recommended that the claimant obtain a part-time job." (AR 42.) And the ALJ discounted the CRT evaluation specifically because in that document, Dr. Lasek "did not offer an assessment of the claimant's mental residual functional capacity despite his impairments," and noted that this evaluation had "little probative value, particularly in light of the longitudinal treatment record." (AR 43.) Finally, despite the little weight accorded Dr. Lasek's opinions, the ALJ noted that the RFC accommodated his concerns regarding Mr. Maskell's "impaired attention and concentration and significant difficulties in relating to others" by limiting the RFC to "simple unskilled work in a low stress environment with limited social interacting with coworkers and routine social interaction with supervisors." (AR 42–43.)

The court concludes that these are not "good reasons" for according little weight to the opinion of Dr. Lasek, Mr. Maskell's treating psychiatrist. Dr. Lasek's treatment records do show, as the ALJ noted, that Mr. Maskell's symptoms improved when receiving appropriate treatment. But "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." *Scott v. Astrue*, 647 F.3d 734, 739–40 (7th Cir. 2011). The ALJ noted that, when being treated successfully, Mr. Maskell could "attend to his personal care, participate in the care of his young daughter, maintain a relatively stable relationship with his girlfriend, [and] work periodically at various 'odd jobs.'" (AR 38.) But the "ALJ did not explain how the performance of these limited activities . . . translates into the ability to perform substantial gainful work . . . in a typical competitive workplace environment." *Miller v. Colvin*, 122 F. Supp. 3d 23, 29 (W.D.N.Y. 2015). As the court in *Miller* explained, a claimant's "performance of basic adaptive activities . . . is not probative of his abilities to, e.g., follow work rules, relate to co-workers, use judgment, deal with work stress, maintain attention and

concentration, and interact appropriately with supervisors" when a treating psychiatrist has assessed that the claimant is "seriously limited [in these areas] by his mental impairments." 122 F. Supp. 3d at 30.

The record is replete with evidence that Mr. Maskell's symptoms are exacerbated by casual contact with strangers and the sorts of basic interpersonal interactions that are unavoidable in any work setting and that he may respond explosively or violently. For instance, according to Mr. Maskell's former employer, he had great difficulty "avoid[ing] disrupting others" and he was fired for "fits of anger and wild outbursts, yelling, screaming, and throwing [a] bottle[,] endangering the employees around him." (AR 313–14.) Mr. Maskell testified that he had similar outbursts at an earlier job, in which he would destroy merchandise and fixtures in the stockroom when he was angry. (AR 61, 69.) In another incident, Mr. Maskell stepped out of a restaurant where he was having dinner with his girlfriend's family and attacked a parked car—he was arrested for criminal mischief. (AR 417, 445–46.) On another occasion, a clerk at a healthcare clinic told Mr. Maskell that there was a problem with his insurance and he responded by yelling and breaking an elevator button; he was banned from returning to that clinic. (AR 446, 790.) He reported to Dr. Lasek in 2012 that, in addition to being banned from the clinic, he had "no trespass orders at 2 previous jobs . . . and his parents' apartment complex." (AR 456.) He also testified, consistent with what he told doctors, about the anxiety he feels when riding a bus or shopping and the violent thoughts this anxiety produces. (AR 63, 66.)

This evidence is consistent with Dr. Lasek's specific opinion that Mr. Maskell's mental illness was "characterized by adverse responses to seemingly trivial circumstances" and that he "responds with extreme mood swings, frustration, anger and this leads to externalizing symptoms such as screaming, hitting objects & risk for attacking others can be high when he perceives a

threat from others." (AR 795.)  But the ALJ's decision minimizes or omits much of this evidence, and does not consider whether any of it supports Dr. Lasek's opinion.  For instance, the ALJ referred to the reason Mr. Maskell was fired from Casella as simply "the incident leading to his termination," but did not detail what that incident was or address its consistency with Dr. Lasek's opinion.  (AR 44.)  Nor does the decision mention Mr. Maskell's testimony about his outbursts at an earlier job or the other evidence of his outburst at a doctor's office.  An ALJ may not "cherry-pick" evidence to support the weight he accords a treating physician's opinion.  *Scott*, 647 F.3d at 40; *Tim v. Colvin*, No. 6:12-cv-1761, 2014 WL 838080, at *7 (N.D.N.Y. Mar. 4, 2014).  In light of the nature of Mr. Maskell's mental impairments, this evidence must be taken into account in evaluating the weight accorded Dr. Lasek's opinion and in determining the RFC as a whole.

Nor is Dr. Lasek's one-time recommendation that Mr. Maskell obtain a part-time job a good reason for discounting the doctor's opinion.  Dr. Lasek also noted on two occasions that he did not believe Mr. Maskell could engage in part-time work, but these notes were omitted by the ALJ in his decision.  (AR 41, 760, 762.)  As noted above, an ALJ cannot "cherry-pick" evidence in determining the weight accorded a doctor's opinion.

Because the ALJ has failed to give "good reasons" for discounting the opinion of Mr. Maskell's treating physician, the case must be remanded.  *Snell*, 177 F.3d at 133.

### B.    David Gauthier

Mr. Maskell also challenges the ALJ's determination that the opinions of David Gauthier, his treating mental-health therapist, should also be accorded little weight.  (AR 43; Doc. 8-1 at 13–14.)  Mr. Gauthier, who treated Mr. Maskell from at least January 2013 to January 2015, offered opinions that generally agreed with the assessments of Dr. Lasek.  (AR 664, 669, 689, 815.)  While Mr. Gauthier is not an "acceptable medical source," his opinion may nonetheless be

accorded weight under SSR 06-03p.[3] Under that ruling, an ALJ considers factors similar to those listed in 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6): the length and frequency of the treatment relationship, the consistency of the opinion with other evidence, the degree to which the source presented relevant supporting evidence, the depth of explanation in the opinion, whether the source has a specialization related to the claimant's impairments, and any other relevant factors. *Reynard v. Colvin*, 220 F. Supp. 3d 529, 537–38 (D. Vt. 2016) (citing SSR 06-03p). On remand, the ALJ should reconsider the weight accorded the opinions of Mr. Gauthier for substantially the same reasons as discussed with respect to Dr. Lasek.

## III. Other Challenges

Mr. Maskell identifies two other aspects of the ALJ's RFC determinations that he believes are in error. First, he contends that the record demonstrates "severe limitations in his ability to respond appropriately to coworkers and supervisors," which the ALJ did not appropriately consider. (Doc. 8-1 at 8–10.) Since the case must be remanded for a reevaluation of Mr. Maskell's credibility and the weight accorded Mr. Maskell's treating psychiatrist, the court need not address this argument. On remand, the ALJ should consider the extent to which a new credibility determination and a reweighting of the opinions of Dr. Lasek and Mr. Gauthier affect the RFC determination.

Second, he argues that the definition of "stress" employed by the ALJ in the RFC finding is unsupported by the record and does not reflect the kinds of situations that can exacerbate or trigger Mr. Maskell's mental impairments. (*Id.* at 14–15.) The RFC determined by the ALJ limited Mr. Maskell to working in a "low stress environment (defined as requiring little to no change in the work setting and little to no need for the use of judgment)." (AR 37.) Mr. Maskell

---

[3] SSR 06-03p was rescinded for claims filed on or after March 27, 2017. Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15263-01 (Mar. 27, 2017).

argues that this limitation finds no support in the record and that the ALJ did not properly analyze what kinds of events or interactions can trigger Mr. Maskell's reactions.

The court agrees. In SSR 85-15, the Social Security Administration explained that, "[s]ince mental illness is defined and characterized by maladaptive behavior, it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings," and that "mental illness is characterized by adverse responses to seemingly trivial circumstances." As a consequence, "[d]etermining whether or not these individuals will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult," and the ALJ should engage in an "individualized" and "thorough" evaluation of "[a]ny impairment-related limitations created by an individual's response to demands of work." *Id.*; *accord Stadler v. Barnhart*, 464 F. Supp. 2d 183, 188–89 (W.D.N.Y. 2006) (quoting SSR 85-15 and explaining that ALJ "must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work"); *Wallace v. Comm'r of Soc. Sec.*, No. 5:11-cv-26, 2012 WL 461809, at *9 (D. Vt. Jan. 10, 2012) (citing SSR 85-15 and *Stadler*).

The ALJ's decision does not engage in this individualized analysis of the causes of stress for Mr. Maskell. The ALJ's explanation consists only of generalized statements that he considered Dr. Lasek's and Mr. Gauthier's opinions regarding Mr. Maskell's "impaired attention and concentration and significant difficulties in relating to others," and accounted for it in the RFC. Given that the primary symptom of Mr. Maskell's impairments appears to be his adverse

responses to trivial circumstances, a more individualized assessment of his response to stressors is necessary.[4]

## Conclusion

For the reasons stated above, Mr. Maskell's Motion to Reverse the Commissioner's Decision (Doc. 8) is GRANTED, the Commissioner's Motion for Order Affirming the Commissioner's Decision (Doc. 9) is DENIED, and the case is REMANDED for further proceedings consistent with this opinion.

Dated at Rutland, in the District of Vermont, this 27 day of June, 2017.

Geoffrey W. Crawford, Judge
United States District Court

---

[4] The court notes a related deficiency in the ALJ's decision. At step four, in determining whether a claimant can perform past relevant work, an ALJ must "compare [the] residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(f), 416.920(f). "When the [claimant's] impairment is a mental one, special 'care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, *e.g.*, speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.'" *O'Halloran v. Barnhart*, 328 F. Supp. 2d 388, 395 (W.D.N.Y. 2004) (quoting SSR 82-62).

The ALJ here did not obtain such a precise description. At the hearing, the ALJ determined only that Mr. Maskell's prior position was categorized as a salvage laborer, that it was unskilled work, at a medium exertion level as performed generally and at a light exertion level as previously performed by Mr. Maskell. (AR 74–76.) In his decision, the ALJ made no specific findings regarding the mental demands or "particular job duties" of working as a salvage laborer "likely to produce tension and anxiety." (AR 44.)